UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

JAMES L. LANGLEY,

             Debtor.

_____/

 UNITED STATES TRUSTEE,

             Plaintiff,

v.

 JAMES L. LANGLEY,

             Defendant.

_____/

Case No. DG 10-11900
Hon. Scott W. Dales
Chapter 7

Adversary Pro. No. 12-80187

OPINION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                United States Bankruptcy Judge

The United States Trustee, Daniel McDermott (the "UST"), filed suit against chapter 7

debtor James L. Langley (the "Defendant") to revoke the Defendant's discharge. The court held

a bench trial in Grand Rapids, Michigan on March 14, 2013. Both parties appeared through

counsel. This Opinion and Order constitutes the court's findings of fact and conclusions of law

in accordance with Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R.

Bankr. P. 7052.

I.  JURISDICTION

The Defendant's filing of his voluntary petition commenced a case over which the United

States District Court has jurisdiction pursuant to 28 U.S.C. § 1334(a). The District Court has

referred the Defendant's bankruptcy case and this adversary proceeding to the United States

Bankruptcy Court pursuant to 28 U.S.C. § 157(a), as set forth in the District Court's Local Rule 83.2(a).

Because the controversy involves a challenge to the Defendant's discharge, the matter is clearly a "core proceeding" as defined by Congress in 28 U.S.C. § 157(b)(2)(J). Accordingly, notwithstanding recent challenges to the Bankruptcy Court's authority to enter final judgments,[1] the court finds that it has authority to enter final judgment in this matter.

## II. ANALYSIS

A.      Summary of the Case

The UST, exercising his statutory prerogative under 11 U.S.C. § 727(d), seeks to revoke the Defendant's discharge on two theories that remained in contention at trial.[2] First, he argues that the Defendant fraudulently obtained his discharge by concealing from the chapter 7 trustee (the "Trustee") 1,696 shares of F.S. Bancorp stock (the "Stock"). Second, the UST contends that the Defendant knowingly and fraudulently acquired property of the estate that he failed to report and failed to surrender, contrary to his statutory duties and the Trustee's demands.

The Defendant denies that he fraudulently concealed any assets from the Trustee, and instead assigns blame to his former counsel, John Van Elk. More specifically, the Defendant contends that he disclosed the Stock to Mr. Van Elk during his pre-filing consultations and that Mr. Van Elk failed to include the information on the Defendant's schedules. The Defendant offered no meaningful explanation, however, for his postpetition disposition of the Stock and diversion of the proceeds to his personal use, except perhaps to say that he eventually settled with the Trustee and returned most of the money.

---

[1] *Stern v. Marshall*, __ U.S. __, 131 S. Ct. 2594 (2011).

[2] Other issues surrounding the Defendant's exemption claims and his supposed failure to disclose certain causes of action involving the alleged embezzlement by a former employee were resolved or abandoned before trial, as the UST's counsel confirmed during his opening statement.

The court admitted the testimony of five witnesses, including Mr. Langley, his friend (Cynthia Cooper), his bankruptcy trustee (Stephen L. Langeland), his former counsel (John Van Elk), and Mr. Van Elk's former paralegal (Laurie J. Tange).  The court also admitted seventeen documents into evidence without objection, principally regarding the Defendant's interest in, and disclosure or concealment of, the Stock that lies at the heart of this adversary proceeding.  The court has also considered the various iterations of the Defendant's bankruptcy schedules and other statements, as well as motions filed with the court, and with the consent of the parties has taken judicial notice of the Defendant's base case docket pursuant to Fed. R. Evid. 201.

B.     Background Facts

The Debtor's mother, Dorothy Mae Langley, held the Stock until her death on April 2, 2008.  *See* Exh. 5.[3]  Apparently by bequest or descent, the Stock was transferred to the Defendant on or about October 30, 2008.  *See* Exh. 6.  Shortly thereafter, on November 18, 2008 (the "Initial Conference"), the Defendant first sought bankruptcy counseling from John Van Elk, a bankruptcy attorney located in Allegan, Michigan.  Mr. Van Elk testified that although he and the Defendant went through an initial intake form (Exh. 15) and discussed filing a bankruptcy petition at the Initial Conference, there was some confusion and uncertainty regarding the Defendant's businesses.  *See* Transcript of Trial Held March 14, 2013 ("Tr.") at 67:1-4; 68:20-69:7.  Therefore, they agreed to postpone taking additional, formal steps toward a bankruptcy filing until after the Defendant gathered the necessary documents and resolved the issues regarding his businesses.  Tr. 67:4-7.

The Defendant returned to Mr. Van Elk's office in March 2009, again thinking he was ready to file for bankruptcy protection.  Mr. Van Elk testified that he provided the Defendant with a list of essential documents and other information that he needed before he could file a

---

[3] All exhibit citations refer to the UST's exhibits as none of the Defendant's exhibits were admitted into evidence.

bankruptcy petition.  Tr. 66:7-67:7.  Again, the Defendant left Mr. Van Elk's office without filing a petition, but with more specific instructions, and with additional information about the various bankruptcy chapters.

On July 2, 2009, the Defendant and his close friend, Ms. Cooper, returned to Mr. Van Elk's office for another consultation (the "July Conference").  Mr. Van Elk met with them for about an hour as they reviewed the intake form the Defendant and Ms. Cooper began to complete almost eight months earlier, after the Initial Conference.  Tr. 72:14-20, Exh. 16.  Among other questions reflected on the form he typically used in preparing bankruptcy schedules, Mr. Van Elk asked the Defendant about his ownership of any "stock and interests in incorporated/unincorporated businesses."  *See* Exh. 15, p. 6, ¶13.  During the Initial Conference, the Defendant answered that he had some valueless Citibank stock.  Similarly, when asked if he had any "interests in estate of decedent or life insurance plan or trust," the Defendant answered, "No."  Exh. 15, p. 6, ¶20.  At the July Conference, the Defendant did not update or change his answers to these questions.  Ms. Cooper testified that she showed Mr. Van Elk the F.S. Bancorp stock certificate and the Defendant's mother's death certificate at the July Conference.  Tr. 148:13-18.  She further testified that Mr. Van Elk promptly handed these documents back to her without scanning or copying them.  Tr. 150:20-151:12.  Mr. Van Elk denies this version of events.

Because the Defendant was still gathering documents and information, and his businesses were still in the process of winding down, Mr. Van Elk once again advised him not to file bankruptcy, but to wait until all of his bills came in, and all tax returns were filed.  Only then could they determine whether he should also file bankruptcy petitions on behalf of his businesses.  Tr. 76:6-15.  In the meantime, Mr. Van Elk gave all the documents he received from the Defendant to his paralegal, Laurie Tange, who arranged to scan them into electronic files.

Tr. 75:10-15.  Both Mr. Van Elk and Ms. Tange independently testified that they never saw any stock certificates, not even one for the Citibank stock.  Tr. 75:16-21; 85:23; 124:13-125:2.[4]

Sometime after the July Conference, Mr. Van Elk proceeded to draft the Defendant's petition, schedules and other statements.  On September 27, 2010, the Defendant came back to Mr. Van Elk's office to review the petition and schedules and sign them, verifying their accuracy under 28 U.S.C. § 1746.  Tr. 77:19-25.  While Mr. Van Elk was meeting with the Defendant, Ms. Tange noticed that the Defendant's 2009 federal tax return (Exh.12) showed $3,392.00 in income attributable to dividends from the Stock, yet he failed to list the Stock on his draft bankruptcy schedules.  She brought this to Mr. Van Elk's attention and he asked the Defendant to explain the discrepancy.  Tr. 80:15-81:10.  Mr. Van Elk testified that the Defendant explained that, due to his financial difficulties, his mother allowed him to collect the dividends but she actually owned the Stock.  Satisfied with this explanation, Mr. Van Elk made some handwritten revisions unrelated to the Stock, and asked the Defendant to sign the petition and related documents as revised.  Exh. 17.  Three days later, Mr. Van Elk filed an electronic version of the petition, schedules, and related documents reflecting the revisions.  Exh. 1; Tr. 81:11-84:10.

The Trustee conducted the meeting of creditors on November 10, 2010, pursuant to 11 U.S.C. § 341 (the "§ 341 Meeting").  At that time, the Trustee administered an oath and asked the Defendant if he had any stocks or bonds other than the Citibank stock.  He lied and said he did not.  The Trustee also asked about any inheritances, past or imminent, and the Defendant denied having received anything by bequest or as part of a decedent's estate.

The Trustee filed a Report of No Distribution (DN 24) on November 11, 2010; the Defendant received a discharge on May 11, 2011; and the court closed the case on June 24, 2011.

---

[4] At trial, the court sequestered witnesses pursuant to Fed. R. Evid. 615.

On March 27, 2012, after S&D Investors, LLC ("S&D") obtained a non-dischargeable judgment against the Defendant, S&D's counsel conducted a judgment debtor examination of the Defendant. During this examination, while the bankruptcy case was no longer pending, the Defendant disclosed the Stock to S&D's counsel. Later that same day, just after learning about the Stock for the first time, Mr. Van Elk told the Defendant to find out how much it was worth. He also called the Trustee and told him about the Stock that his client omitted from Schedule B. Finally, on the Defendant's behalf (though without his signature) Mr. Van Elk filed an amendment to Schedule B disclosing the Stock but listing its value as unknown. Exh. 3. On March 30, 2012, the Trustee filed a Motion to Reopen the Chapter 7 Bankruptcy Proceeding in Order to Administer Assets. Exh. 9. Shortly thereafter, Mr. Van Elk saw the Defendant at his office and asked him if he had determined the value of the Stock. Mr. Van Elk testified that the Defendant told him it was worth $77,000.00 and that he had planned to use the money as his "retirement." Tr. 95:21-22.

On April 11, 2012, Mr. Van Elk relayed a request from the Trustee to the Defendant to turn over the Stock. *See* Exh. 8. He also filed an Amended Schedule B and C to reflect the Stock's value as $77,000.00, reportedly with the Defendant's oral authorization, although the Defendant denies ever authorizing either amendment. *See* Exh. 4. The Defendant did not comply with his attorney's or the Trustee's request to surrender the Stock. To the contrary, on April 16, 2012, he redeemed it for $77,000.00, and by his sworn admission, used the proceeds for his own purposes. *See* Exh. 12.

On May 7, 2012, still waiting for the Defendant to surrender the Stock and growing impatient and concerned, the Trustee filed a Motion for Turnover (Exh. 10), which the court considered at a hearing in Kalamazoo, Michigan, on June 20, 2012. While that motion was

pending, the UST filed this adversary proceeding to revoke the Defendant's discharge.  The court

granted the Trustee's turnover motion by order dated June 22, 2012.  Exh. 11.

A review of the court's docket pursuant to Fed. R. Evid. 201 reveals that after nearly six

months of additional litigation, including the Trustee's objection to the Defendant's claimed

exemption in the Stock, the Trustee and the Defendant entered into a settlement pursuant to

which the Defendant paid $8,000.00 to the Trustee and Ms. Cooper paid an additional

$56,000.00.  *See* Stipulation for Settlement and Order Resolving the Trustee's Objection to the

Debtor's Second Amended Claim of Exemption.  Exh. 14.  The settlement stipulation recites that

the Defendant has substantially complied with the court's turnover order.

C.      Grounds for Revocation

As noted above, the court has already entered the Defendant's discharge, so the grounds

for objecting to the discharge under 11 U.S.C. § 727(a) are not relevant to this dispute.  Instead,

Congress has prescribed a more stringent standard for denying a chapter 7 debtor the benefits of

discharge already entered, reflecting the reliance that parties-in-interest place on the discharge,

and providing an incentive for early and diligent investigation into a debtor's fitness for a

discharge.  *Compare* 11 U.S.C. § 727(a) *with id.* § 727(d).

In this case, the UST  invokes the first two statutory alternatives, which require

revocation of the Defendant's discharge if:

> (1)   such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;
>
> [or]
>
> (2)   the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee . . .

11 U.S.C. § 727(d).  The UST, as plaintiff, has the burden of proof in this adversary proceeding, and must establish his case by a preponderance of the evidence.  *See* Fed. R. Bankr. P. 4005; *Yoppolo v. Sayre (In re Sayre),* 321 B.R. 424, 427 (Bankr. N.D. Ohio 2004) (party seeking to revoke discharge must establish case by at least preponderance of evidence); *cf. Grogan v. Garner,* 498 U.S. 279, 287 (1991) (preponderance standard generally applies in civil proceedings, including exception to discharge, as there is no fundamental right to discharge).

The evidence preponderates in favor of finding that the Defendant obtained his discharge by fraud and that the UST was not aware of the fraud until after the court entered the discharge. The fraud consisted in lying to his counsel and the Trustee about the Stock.  In their last meeting before finalizing the petition and schedules on September 27, 2010, in response to Mr. Van Elk's questions about the dividends disclosed on the Defendant's 2009 federal tax return (*see* Exh. 12), the Defendant explained, falsely, that he listed the $3,392.00 as income on his tax returns, and characterized the income as dividends because his mother owned the Stock, received the dividends, and gave them to him in 2009 because she knew he was experiencing financial difficulty.  The court credits Mr. Van Elk's report of this conversation.

Of course, the story was false, given that the Defendant's mother died on April 2, 2008, according to the Kent County death certificate (Exh. 5), and given that the certificate representing the Stock (Exh. 6) shows that the Defendant owned the Stock as of October 30, 2008.  Mr. Van Elk accepted the explanation, implausible though it was, and filed the original version of Schedule B without listing the Stock.  At trial, he explained that he did not list the dividend income on Schedule I because, believing the dividends were a gift from the Defendant's mother in 2009, he concluded that the Defendant could not count on them as regular income for purposes of his monthly budget.  Tr. 81:3-15.

The Defendant's concealment of the Stock from the Trustee at the § 341 Meeting prompted the latter to issue the Chapter 7 Trustee's Report of No Distribution, (DN 24), and to certify that the Defendant's bankruptcy estate had been "fully administered."  Predictably, and in accordance with the rules, the court promptly entered the Defendant's discharge and, a short time later, closed the case.

Had the Defendant reported his ownership of the Stock truthfully (as he was required to do when answering the Trustee's questions under oath at the § 341 Meeting), the Trustee might have inquired further into the Defendant's reasons for not reporting them on Schedule B in the first place.  The investigation might have prompted the Trustee or the UST to object to entry of the discharge under § 727(a)(2) or (a)(4), especially if the Defendant had given the same false and improbable response that he gave to Mr. Van Elk.

Instead, at the § 341 Meeting, the Defendant continued the deceit by lying (as he did to Mr. Van Elk) that he owned no shares other than the Citibank stock listed on Schedule B.  In this way, he prevented the Trustee or UST from learning of the original non-disclosure of the Stock and investigating the non-disclosure before the court entered the discharge.  The fact that he produced his 2009 tax return, which might have alerted the Trustee to the existence of the Stock, does not preclude the latter from relying on the former's sworn statements and testimony.  The Trustee's failure to ferret out the Stock after reviewing tax documents does not excuse the Defendant's perjury at the § 341 Meeting, and does not give the UST knowledge of the fraud, so as to preclude relief under § 727(d)(1).[5]  In a real and substantial way, the Defendant obtained his discharge through fraud, and the court so finds under § 727(d)(1).

---

[5] When conducting the first meeting of creditors, a chapter 7 trustee is the designee of the United States Trustee.  *See* 11 U.S.C. § 341(b); Fed. R. Bankr. P. 2003(b)(1); *see also* Handbook for Chapter 7 Trustees (July 2002), at Chapter 7, p. 7-1 ("The trustee is the presiding officer at the § 341(a) meeting as designee of the United States Trustee.") (Handbook available at http://www.justice.gov/ust/eo/private_trustee/library/chapter07/index.htm).

Ms. Cooper's testimony to the effect that she remembers showing Mr. Van Elk a copy of the Stock certificate encased in plastic during the July Conference does not change the court's view. Even if the court were to credit Ms. Cooper's testimony, simply flashing a copy of the certificates some fifteen months before filing does not authorize the Defendant to prevaricate in response to Mr. Van Elk's question regarding the dividend income reflected on the 2009 tax return. Mr. Van Elk cannot reasonably be expected to remember the fleeting display of the certificates more than a year before preparing the schedules. More to the point, the Defendant's conduct -- not Mr. Van Elk's -- is the subject of this lawsuit. The Defendant must take responsibility for answering counsel's questions dishonestly. Moreover, the Defendant, when asked by his Trustee point blank about the existence of other shares of stock said, again falsely and under oath, that there were no other shares of stock.

The court rejects as hollow the Defendant's suggestion that he omitted the Stock from the schedules because he and Mr. Van Elk regarded it as valueless after the Defendant consulted a Ms. Olinger from F.S. Bancorp. First, Mr. Van Elk is an experienced bankruptcy attorney who understands that a debtor's obligation to disclose an asset under § 521 does not depend in any way on the value of the asset. Tr. 86:3-8. Second, and more specifically, the initial draft of Schedule B that Mr. Van Elk and the Defendant prepared demonstrates this understanding, as it lists the supposedly valueless Citibank stock. Just before filing, while purporting to verify the accuracy of the Defendant's disclosures, they amended this schedule to reflect a value of $6,000.00. The initial draft, however, shows that Mr. Van Elk and the Defendant understood the obligation to disclose even valueless assets. *Compare* Exh. 1 *with* Exh. 17. The court infers that the Defendant concealed the Stock from Mr. Van Elk despite this understanding.

The court also credits Mr. Van Elk's report of the conversation he had with the Defendant on March 27, 2012 following the creditor's examination in the state court collection proceeding.

The examination took place at Mr. Van Elk's office.  Afterwards, Mr. Van Elk asked the Defendant about the Stock.  Specifically, Mr. Van Elk asked him to determine the Stock's value and report back promptly so that he could amend Schedule B on the Defendant's behalf.  Mr. Van Elk credibly reported that the Defendant expressed disappointment that the Stock had been discovered and said "that was going to be my retirement."  Tr. 95:21-22.  This statement demonstrates awareness of his interest in this valuable, undisclosed asset, and a motive for concealing the Stock.  The statement fortifies the court's conclusion that the Defendant obtained the discharge by fraud.

Similarly, Exhibit 8, which is a letter from Mr. Van Elk to the Defendant describing the Trustee's efforts to recover the Stock, combined with Mr. Van Elk's credible report of his conversation on March 27, 2012, clearly demonstrate that the Defendant knew of his obligation to deliver the Stock to the Trustee.  Nevertheless, on or about April 16, 2012, the Defendant presented the Stock for redemption to F.S. Bancorp and received approximately $77,000.00 in return.  In his Affidavit (Exh. 12), the Defendant admits the redemption and further admits that he used the proceeds for his own purposes.  For example, he spent $9,500.00 to purchase a motor vehicle, $47,000.00 to purchase a life interest in real estate from Ms. Cooper, $9,000.00 to pay the Internal Revenue Service on a presumably non-dischargeable tax debt, and he took an undisclosed amount for himself.  *See* Exh. 12 at ¶¶ 7, 8, 9 and 13.

By this time, of course, the Trustee had become concerned about the Defendant's failure to deliver the Stock.  These concerns prompted the Trustee to file a motion for turnover. Exh. 10.  Although not part of the record adduced at trial, the court recalls that the Defendant appeared, in person and through counsel, at the court's hearing on the Trustee's turnover motion. After consulting Mr. Langley and in his presence, his counsel advised the court that the Defendant did not have the Stock to surrender.  *See* Transcript of Hearing Held June 20, 2012 at

10:19-24.   Neither the Defendant nor his counsel advised the court at that time that the Defendant had redeemed the Stock two months earlier.  Their report prompted the court to enter an order in the form admitted as Exhibit 11, requiring the Defendant either to turn over the Stock or account for it.  The court included the "account for" language as a courtesy to the Defendant and based on the suggestion that he could not locate the Stock.  Like the evidence adduced at trial, the Defendant's selective disclosure at that turnover hearing similarly evinced deceit.  The court infers that he lied to his current counsel about the Stock, just as he lied to former counsel.  The court need not rely on these statements, however, in reaching its conclusion that the Defendant knowingly and fraudulently concealed and diverted property of the estate for his own benefit because the record amply supports the finding without considering the misleading statements made at the June 20, 2012 hearing.

The court's decision to revoke the Defendant's discharge under § 727(d)(1) makes it unnecessary to resolve the UST's request for relief under § 727(d)(2).  Nevertheless, the proofs support revocation under both subsections.  The court includes the following findings for purposes of completeness and to assist in appellate review, if undertaken.

First, the proofs establish that the Stock was included within the property of the estate on the petition date.  *See, e.g.*, Exh. 6 (stock certificate showing Defendant's ownership as early as October 30, 2008); *In re Yonikus*, 974 F.2d 901 (7th Cir. 1992) (failure to report prepetition property warrants revocation under § 727(d)(2)).  Even assuming, *arguendo*, that § 727(d)(2) addresses postpetition acquisition as at least one commentator has suggested,[6] there is evidence that the Stock generated dividends, which the Defendant acquired postpetition, as F.S. Bancorp declared them.  *See* Exh. 12 (2010 and 2011 IRS Form 1040 reporting dividend income from the Stock); *see also* 11 U.S.C. § 541(a)(6) (proceeds of property of the estate included within the

---

[6] *See* Collier on Bankruptcy, ¶ 727.17[4] (16th ed.) (observing that § 727(d)(2) "appears to apply only to property acquired during the bankruptcy case") .

estate).    The Trustee credibly testified, without contradiction, that the Defendant never surrendered the dividends he acquired or became entitled to acquire postpetition.  Tr. 141:1-3.

The court's findings that the Defendant lied to Mr. Van Elk and the Trustee at the September 27, 2010 pre-filing meeting and the § 341 Meeting (respectively) similarly support a finding of fraud under § 727(d)(2).  Likewise, his redemption of the Stock after his attorney and the Trustee instructed him to surrender it, his use of the proceeds for his own personal purposes, and his comment about the now-thwarted role the Stock was to play in his "retirement" plan, satisfactorily establish his fraudulent intent.  The court finds that he knowingly and fraudulently concealed and retained the Stock and dividends to defeat the rights of the Trustee and the creditors.

Although the Defendant suggested at trial that his disclosure of the Stock to S&D during a creditor's examination undercuts a finding of fraud, the court is not persuaded.  First, he made the disclosure long after he thought his bankruptcy case had ended.  Second, it is equally plausible that the Defendant disclosed the Stock to the creditor so its value would be applied against a non-dischargeable fraud debt, rather than shared *pro rata* with general unsecured creditors holding dischargeable claims, much as he did by paying the Internal Revenue Service after he redeemed the Stock.  Third, disclosing the Stock to a creditor after the bankruptcy case has been closed is not equivalent to reporting and surrendering it to the Trustee, and the circumstances surrounding the Stock, including the Defendant's own admissions, plainly establish his fraud.

Moreover, the fact that the Defendant settled with the Trustee by eventually repaying most of the value of the Stock does not excuse him from concealing and misappropriating it in the first instance.  A thief who gets caught and returns the stolen property is still a thief.

Accordingly, in addition to finding that the Defendant obtained his discharge through fraudulent concealment of the Stock, the court also finds that he fraudulently failed to report and surrender it, along with the postpetition dividends derived therefrom, and the proceeds of the postpetition redemption.

### III.  CONCLUSION AND ORDER

The evidence adduced at trial amply establishes grounds for revocation.  For these reasons, the court will enter a separate judgment revoking the Defendant's discharge under 11 U.S.C. § 727(d)(1) and (d)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter a separate judgment revoking the Defendant's discharge, and awarding costs to the Plaintiff, and serve the judgment upon the entities included on the Defendant's bankruptcy matrix.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order, and the judgment to be prepared, pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon James L. Langley, Robert L. Sayfie, Esq., Stephen L. Langeland, Esq., and Dean E. Rietberg, Esq.

[END OF ORDER]

**IT IS SO ORDERED.**

**Dated March 29, 2013**



Scott W. Dales
United States Bankruptcy Judge